UTICA,
August, 1829.

Coggeshall
v.
American Ins.
Company.

---

## Coggeshall *vs.* The American Insurance Company of New-York.

This was an action on a policy of insurance, and came before the court on a case made by the parties. The policy bears date 18th October, 1826, and assumes the risk upon all kinds of lawful goods and merchandises laden or to be

Where a policy of insurance was effected upon goods and merchandises laden or to be laden on

board a ship for and during the term of six calendar months, without reference to any particular voyage, the risk to commence from and immediately following the loading of the goods on board of the vessel, *It was held*, that a trading voyage was evidently contemplated by the parties; that the policy was to be construed in the same manner as if a trading voyage had been expressed, with liberty to touch and trade at such ports and places on the globe as the insured should choose, subject to the accustomed and usual mode of transacting business at the several places visited by the vessel; and that however often the goods might be changed the policy would attach.

If goods, whilst in the transportation from the shore to a ship engaged in a trading voyage, are lost, the insurer is liable, if the means employed for such transportation are according to the known course of trade and established usage of the place where the goods are thus attempted to be laden on board the vessel.

*It seems* that it is not an established point, in this country, that the insurer would be discharged by the insured taking the goods in his own lighter for the purpose of landing them, if the goods are lost.

Under-writers may contract so far as to incur risks antecedent to the date of the policy.

UTICA,
August, 1829.

Coggeshall
v.
American Ins.
Company.

laden on board the good ship Governor Clinton, for and during the term of six calendar months, commencing on the 10th July, 1826, "beginning the adventure upon the said goods and merchandises, from and immediately following the loading thereof on board of the said vessel from 10th July, 1826, and so shall continue and endure until the said goods and merchandises shall be safely landed on 10th January, 1827, at noon." By a marginal note, the policy was extended for two months from 10th January, 1827, for an additional premium of one per cent. The sum insured was $4000; the premium paid, three per cent.

The ship was engaged, at the date of the policy, in a trading voyage on the western coast of South America, and arrived off the port of Lambayeque, on that coast, on or about the 4th August, 1826. Lambayeque is a port of entry with a custom-house, and carries on an extensive trade, consisting chiefly of sugar, tobacco and *plata pina* or virgin silver. No ship can come nearer to the port than within about the distance of three miles. The only mode of carrying on trade with the port is, for vessels to lay off and on, or come to an anchor at the distance of about three miles, and to send their cargoes on shore and receive return cargoes by means of rafts with sails, called *balsas*, which mode of communication between vessels and the shore is usually safe, and accidents do not happen to the *balsas* more frequently than to ordinary lighters in the ports and harbors of the United States. This mode of communication with the port is familiarly known to all who trade to that coast. The use of *balsas* is not confined to Lambayeque, but extends to Guayaquil, Eaton, Sechusa and Payta, on the western coast of South America. The *balsas* are used at Payta and Guayaquil, though the water there would admit the use of ordinary boats, being considered more convenient and safe than ordinary boats; at Lambayeque, however, the surf is so violent as to render it dangerous to land or ship any cargo in ordinary boats. *Balsas* are made of balsa wood, which is nearly as light and buoyant as cork, by laying several tiers of logs above each other crossing at right angles, secured by lashings and floored on the top with split bamboo. They are navigated by the in-

habitants of the coast with great skill, expedition and safety, often proceeding along the coast in voyages of several hundred miles and going out of sight of land. They sail before the wind at the rate of five or six miles an hour, and beat against it at the rate of two or three miles an hour.

The vessel having approached within about three miles of the port, the water being too shoal to admit of a nearer approach, the plaintiff, who was on board of the vessel during the voyage in the capacity of supercargo, together with his clerk and two seamen, went on shore for the purpose of purchasing and bringing on board of the vessel some vegetables, fowls and other provisions for the use of the ship, and also for the purpose of purchasing and bringing on board a quantity of *plata pina* or virgin silver. About four o'clock in the afternoon of 12th August, 1826, a *balsa*, having on board the plaintiff and his companions and a suitable number of men from the shore to navigate the *balsa* left *Lambayeque* for the ship laden with vegetables and fowls and other provisions for the use of the ship, and *ten baskets of plata pina*, nine of which were the individual property of the plaintiff, having been bought by him with the proceeds of his share of the outward cargo, for the purpose of being laden on board the ship. When the *balsa* left the shore the weather was fine and the sea appeared calm. The *balsa* proceeded without difficulty until she had got about half way through the breakers, when the sea increased greatly in roughness, and three very heavy seas in succession struck the *balsa* with so much violence, as to break one of her logs and loosen the fastenings of part of her cargo and wash over-board one of the baskets of *plata pina* belonging to the plaintiff, whereby it was totally lost. The roughness and violence of the sea were so great at the time of the disaster, as not only to endanger all the cargo laden on board the *balsa*, but also to jeopardize, in the most imminent degree, the lives of all the persons on board. When the *balsa* left the shore to proceed to the ship, the cargo on board was well fastened and secured, and the disaster and loss are attributable solely to the extraordinary swell and roughness of the sea, which unexpectedly occurred while the

Vol. III.                    36

*balsa* was proceeding towards the ship, and could not have been prevented by human foresight or skill. The roughness of the sea was occasioned partly by a sudden rise of wind, and partly by the coming in of the tide. The value of the basket of *plata pina* belonging to the plaintiff which was lost, including costs and charges, was $2170,79. There was no objection to the sufficiency of the preliminary proofs which were exhibited on 7th February, 1827. A stipulation was entered into between the parties as to the amount of the verdict, in case judgment should be given for the plaintiff.

*G. Griffin*, for plaintiff. The policy in this case contemplated a trading voyage, and covered not only the original cargo, but also any cargo that might be substituted therefor in the course of the traffic within the time limited in the policy. It is a policy on time, and in its very nature contemplates a trading voyage and substituted cargoes. The intent evidently was, that the successive cargoes on board the vessel during the continuance of the adventure, within the time limited, should be covered by the one policy of insurance. In adjudicating upon policies of insurance, courts look closer into the intent of parties, and are less controlled by the words of the instrument than in determining on any other contract. (1 Taunton, 474. 8 East, 373. 5 Maule & Selw. 6. 6 Mass. R. 197.)

The policy attached to the cargo on board the *balsa* in its transportation from the port to the vessel, as much so as if it had safely arrived and been stowed away in the ship. The *balsas* are the ordinary and only safe means of conveyance of cargoes at this particular place from the shore to the vessel. What was done, was done in the usual course and manner of doing it. The usages of trade incorporate themselves into the policy; (Phil. on Ins. 18; 3 Burr. 1707; 5 Barn. & Ald. 238;) and in the language of Lord Mansfield, in *Pelley* v. *The Royal Exchange Assurance Company*, (1 Burr. 348,) it is absurd to suppose, when the end is insured, that the usual means of attaining it are meant to be excluded.

*J. Duer*, for the defendants. The policy did not attach upon the *plata pina*, it not having been laden on board the

ship. The risk eommenced from and immediately following the loading of the goods. The express terms of the contract exclude all enlargement by construction. Where words like those used in this case are employed, the goods must be on board the vessel, or the policy does not attach. (1 Marshall, 249. 6 Mass. R. 208.) The terms of the policy expressly exclude the risk of loading, and there is no evidence that there were any goods whatever laden previous to the attempt to load the virgin silver.

The policy will not include the proceeds of the original cargo. Had the goods laden on board the vessel been insured from one place to another, the policy would have attached only to the goods on board at the time of effecting the insurance ; and because time is substituted for places, no broader construction can be given to the contract. How could the insurers calculate the risk of the adventure, without being informed of the dangers of the trade in which the plaintiff chose to embark ? At the time of the loss of the *plata pina,* the connection of vessel and cargo had not commenced. The goods to be covered by the policy must belong to the vessel, and be under the control of the master. In this case they were under the direction of the owner, never reached the ship, and consequently were not under the control of the master.

*Griffin,* in reply. The *plata pina* was purchased with the proceeds of the plaintiff's share of the outward cargo ; consequently, previous to the disaster, there was a cargo *laden* on board the vessel. As to the dangers of the trade in which the plaintiff engaged, the defendants have no cause of complaint. By entering into a policy on time, all reference to place is excluded ; and as long as the plaintiff did not embark in an unfrequented and unusually hazardous trade, the policy is operative and the insurers are liable.

*By the Court,* Savage, Ch. J. The policy in this case being on time, is subject to the rules of construction in other cases, except as to the commencement and termination of the voyage. The risk is made to commence on the loading

UTICA,
August, 1829.

Coggeshall
v.
American Ins.
Company.

the goods on board the vessel on and from the 10th of July, 1826. The policy was entered into in October following. But parties may contract, and have done so in this case, so as to incur risks antecedent to the date of the contract. The risks commenced upon goods on board the vessel on the 10th July, provided any were then on board. The evidence on that point is, that the nine baskets of *plata pina* which belonged to the plaintiff, were purchased with *his share of the outward cargo.* The plaintiff's goods on board, then, must have been of much greater value than the amount insured; and this I think is conclusive, being uncontradicted, to shew that the policy attached upon the goods with which the *plata pina* was purchased.

Did the policy attach to the *plata pina*, or was the voyage ended? Where the adventure was to run six months, with the privilege to the insured to extend it two months longer, a trading voyage was evidently contemplated by both parties; and it cannot be fairly construed to be at an end at the first port which the vessel makes, but is to continue in the same manner as if a trading voyage had been expressed, with liberty to touch and trade at such ports and places on the globe as the insured shall choose, subject to the accustomed and usual mode of transacting business at the several places visited by such vessel; and however often the goods may be changed, the policy attaches. Any other construction would suppose extreme folly and weakness in the insured. The idea that a person engaged in shipping goods intends to sail upon the ocean for six or eight months with the goods, and return them in specie to the port of departure, or any other port without the liberty of disposing of them, is too preposterous to be for a moment admitted.

In *Grant* v. *Paxton*, (1 Taunton, 474.) Mansfield, chief justice, speaking of the case of *Grant* v. *Decarvin*, where the policy was in terms similar to what I contend was the meaning of the parties in this case, says, " It was on goods laden in London, and to continue on the *same* goods, which, literally taken, would be absurd, because goods are taken out for the purpose of trading and barter, not to be brought home again in specie;" and that consequently the captain (the

agent of the insured) had a right to trade with his goods as often as he pleased, and the insurance attached upon the goods acquired by him in the course of his trading. "If the goods described in the policy are exchanged at any port in the course of the specified voyage, the policy will apply to the substituted goods, without any express provision for this purpose, where the insurance is to several ports, which seems to imply the liberty of exchanging the goods." (Phillips on Ins. 69, citing Valin, 2 vol. p. 78, n. t. a. 27.) A policy on time simply, where no ports are mentioned, must, as already remarked, necessarily imply a trading voyage, which again implies liberty to dispose of the goods insured. It seems to me, therefore, no doubt can be entertained that the policy attached to the proceeds of the goods insured.

It is objected, however, that the substituted goods were not on board of the vessel, but were lost in their passage from the shore to the vessel in the plaintiff's own lighter. Could we reasonably entertain the opinion that these were the first goods of the plaintiff on board the vessel, or attempted to be put on board subject to the policy, then undoubtedly the policy would never have attached. By the terms of the policy, the adventure commenced from the *loading* the goods on board on or after the 10th July ; but as the plaintiff had previously goods on board, with the proceeds of which the *plata pina* was purchased, the supposition cannot be admitted. As the transaction in question cannot, therefore, be considered the beginning or the termination of the adventure, the cases referred to, shewing that where the insured has taken his goods into his own possession in his own lighters the risk ceases, can have no application to this case. Where the defendants insured the plaintiff's goods upon a trading voyage, the insurance was intended to cover those goods, and any other goods, the property of the plaintiff, procured with their proceeds, until the expiration of the term insured for. As the goods were not on board the vessel when lost, the liability of the defendants must depend upon the known course of trade and established usage, with which insurers are supposed to be conversant. Upon this principle, the plaintiff recovered in *Pelly* v. *The Royal Exchange Co.* (1 Burr. 341,) for the sails,

tackle and apparel of the ship while in a *bank saul* or ware house built for their protection upon an island, while the ship was refitting; it being usual for vessels in the same trade to clear and refit their vessels in that place. So, also, the case of *Tierney* v. *Etherington*, referred to by Lord Mansfield in the former case, (1 Burr. 348,) the insurance was on goods in a Dutch ship from Malaga to Gibraltar, and from thence to England or Holland: the goods might be unloaded at Gibraltar, and re-shipped in an English ship for England or Holland. When the ship arrived at Gibraltar, there was no British ship there, and the goods were put into a store ship, which was considered as a ware house, and were lost in a storm. Ch. Justice Lee said, the construction of the policy should be according to the course of trade in this place, (meaning Gibraltar) and this appears to be the usual method of unloading and re-shipping in that place when no British ship was there. So in this case, it appears that the *balsas* were the usual and indeed the only means of loading and unloading vessels; and even if we were to adopt the doctrine that the underwriter is discharged by the plaintiff taking his goods in his own lighter, (which is certainly not an established point in this country,) still it does not apply in this case, 1. Because this was not the termination of the adventure; and 2. Because the *balsa* was not the *balsa* of the plaintiff, although employed by him and paid by him; yet as to him it was a public lighter. Whether it belonged to the custom-house at that place does not appear; but if not, it was a conveyance public to all who chose to transmit goods to or from the shore, and was, as to its navigation, not under his (the plaintiff's) control. This opinion is fortified by the opinion of the court in *Parsons* v. *Mass. Fire & Marine Ins. Co.* (6 Mass R. 202, 8,) where Sedgwick, justice, says: " For although in the commencement of the voyage the insurance did not attach upon the goods while in the act of transportation in boats to the brig, nor until they were on board, and this from the terms of the policy, yet during the voyage the goods were as much protected by the policy in the boats, while they were employed as auxiliary to the legitimate purposes of the voyage, as they were on board the

ship. For all the purposes of the voyage, boats so employed are very reasonably considered as part of the ship." These remarks are applicable here; for though the words of the policy in this case are not the same as those in the case last referred to, yet I have considered the policy equally comprehensive in the construction which must be given to it, if it must be supposed to have any rational meaning.

UTICA,
August, 1829.

The plaintiff is entitled to judgment.